b

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## ALEXANDRIA DIVISION

| | |
|---|---|
| **ROBIN LASHONDA PELLERIN,** Appellant | **CIVIL DOCKET NO. 1:18-CV-01131** |
| **VERSUS** | **JUDGE DRELL** |
| **UNITED STATES COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,** Appellee | **MAGISTRATE JUDGE PEREZ-MONTES** |

## REPORT AND RECOMMENDATION

Appellant Robin Lashonda Pellerin ("Pellerin") appeals the denial of her application for social security disability insurance benefits ("DIB"). Because the Commissioner's decision is supported by substantial evidence, Pellerin's appeal should be DENIED..

## I.    Background

### A.    Procedural Background

Pellerin filed an application for DIB on January 13, 2016, alleging a disability onset date of June 1, 2015 (ECF No. 12-1 at 223) due to C6-7 disc herniation; C3-4 and C4-5 bulges; L3-4 herniation; L5-S1 herniation; fibromyalgia and IBS; depression and anxiety; sleep apnea; beta thalassemia–chronic anemia[1]; chronic asthma, chronic

---

[1] Beta thalassemia is a blood disorder that reduces the production of hemoglobin. Hemoglobin is the iron-containing protein in red blood cells that carries oxygen to cells throughout the body. In people with beta thalassemia, low levels of hemoglobin lead to a lack of oxygen in many parts of the body. Affected individuals also have a shortage of red blood cells (anemia), which can cause pale skin, weakness, fatigue, and more serious complications.

bronchitis, and COPD.  ECF No. 12-1 at 246.  That application was denied by the Social Security Administration ("SSA").  ECF No. 12-1 at 167.

A de novo hearing was held before an Administrative Law Judge ("ALJ") at which Pellerin appeared with her attorney, a witness, and a vocational expert ("VE").  ECF No. 12-1 at 91.  The ALJ found that Pellerin has severe impairments of degenerative disc disease of the cervical and lumbar spine; restrictive pulmonary disease; fibromyalgia; obesity; major depressive disorder; and anxiety disorder.  ECF No. 12-1 at 28.  However, Pellerin does not have an impairment or combination of impairments that meets or medically equals a listed impairment in Appendix I of 20 C.F.R. Part 404, Subpart P.  ECF 12-1 at 28.  The ALJ found that Pellerin has the residual functional capacity to perform a limited range of sedentary work and is able to do some sedentary work that exists in significant numbers in the national economy.  ECF No. 12-1 at 30, 36-37.  The ALJ concluded that Pellerin was not disabled from June 1, 2015 through the date of her decision on August 28, 2017.  ECF No. 12-1 at 37.

Pellerin requested a review of the ALJ's decision, but the Appeals Council declined to review it.  The ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").  ECF No. 12-1 at 5.

Pellerin filed this appeal for judicial review of the Commissioner's final decision.  ECF No. 1.  Pellerin contends on appeal that the ALJ committed reversable

---

*See* United States National Library of Medicine: beta thalassemia, *available at* https://ghr.nlm.nih.gov/condition/beta-thalassemia.

error in refusing to accept the testimony of the VE as to the ability of Pellerin to do sedentary work with the limitations identified by the medical evidence and testified to by Pellerin (that she would be off-task and miss several days of work per month), which would eliminate all of the sedentary jobs identified by the VE.  ECF No. 15.

B.  Medical Records

In October 2008, Pellerin underwent a C5-6 anterior cervical discectomy and fusion due to a C5-6 herniated nucleus pulposis.  ECF No. 12-1 at 390-91.  In November 2008, straightening of the cervical spine was noted.  ECF No. 12-1 at 387.

In July 2011, Dr. Kenneth McCarron evaluated Pellerin for complaints of chronic back pain.  ECF 12-1 at 493.  X-rays of Pellerin's spine showed an old, mild anterosuperior compression deformity of T12, but no acute abnormality.  ECF No. 12-1 at 378, 642.  An MRI of her lumbar spine showed multilevel acquired degenerative spinal stenosis.  ECF No. 12-1 at 380, 383, 500.  An Hgb electrophoresis test showed Pellerin has beta thalassemia traits.  ECF No. 12-1 at 376, 496.  Dr. McCarron diagnosed spinal stenosis and beta thalassemia.  ECF No. 12-1 at 493.

In September 2011, due to Pellerin's complaints of backache, an MRI of Pellerin's lumbar spine at L3-4 and L4-5 showed a minimal broad-based central disc protrusion along with hypertrophic degenerative changes involving the facet joints, resulting in minimal central canal stenosis.  ECF No. 12-1 at 383.

Pellerin was initially evaluated by Dr. Andrew F. Clarke, an internal medicine physician, in January 2012.  ECF No. 12-1 at 571.  Dr. Clarke noted that most of Pellerin's issues appeared to be associated with her lifestyle, such as sciatica that

3

almost completely went away when she had lost 70 pounds in the past, but returned when she regained the weight. ECF No. 12-1 at 571. At that time, Pellerin weighed 238 pounds. ECF No. 12-1 at 572. Dr. Clarke noted that Pellerin had a lot of stress, her left hip would occasionally "lock up on her," and she had a burning pain in the right thigh. ECF No. 12-1 at 572. Dr. Clarke diagnosed radiculitis of her leg, sleep disturbance, fatigue, malaise, anemia, and arthralgia, and prescribed Neurontin. ECF No. 12-1 at 573.

In February 2012, Dr. Clarke increased Pellerin's Neurontin for her spinal stenosis and lumbar neuralgia, and counseled her concerning lifestyle changes. ECF No. 12-1 at 578. In March 2012, Dr. Clarke noted that Pellerin had begun using a TENS unit that helped her back pain. Dr. Clarke referred Pellerin to a rheumatologist for her arthralgia with RNP (ribonucleoprotein antigen), and advised her to follow his basic recommendations for lifestyle to address her fatigue, malaise, and obesity. ECF 12-1 at 575-76.

Pellerin was evaluated by Dr. Ladislas Lazaro, a rheumatologist, in September 2012 due to findings of positive ANA (antinuclear antibody) and RNP, and complaints of pain all over. ECF No. 12-1 at 503. Dr. Lazaro found Pellerin has generalized myofascial body pain in the low back/hip area that was not joint-related. ECF No. 12-1 at 503. Dr. Lazaro also found Pellerin had severe fatigue and severe anxiety. ECF No. 12-1 at 504. Dr. Lazaro concluded Pellerin's hip pain is caused by bilateral trochanteric bursitis combined with obesity, lack of physical conditioning, and a weak

back.  ECF No. 12-1 at 506.  Dr. Lazaro also diagnosed fibromyalgia syndrome with a significant emotional component  ECF No. 12-1 at 506.

In September 2012, Pellerin weighed 257 pounds.  ECF NO. 12-1 at 581.  Dr. Clarke agreed with Dr. Lazaro that a lot of Pellerin's chronic musculoskeletal pain and headaches were stress-induced and recommended counseling as well as simple lifestyle changes.  ECF NO. 12-1 at 582.

In January 2013, Dr. Clarke found Pellerin weighed 263 pounds.  ECF No. 12-1 at 585.  Pellerin had stopped consuming almost all starches and sugars and was trying to walk on a treadmill.  ECF No. 12-1 at 585.  Pellerin reported episodes of fairly severe back pain, but her fibromyalgia was stable.  ECF No. 12-1 at 585.  Dr. Clarke prescribed Cymbalta (to replace Lexapro and Lyrica) for her pain and depression, and continued her high dose vitamin D. ECF No. 12-1 at 586.  In February, Pellerin reported Cymbalta had reduced her pain and she was able to increase her time on the treadmill.  ECF No. 12-1 at 587.  She weighed 260 pounds. ECF No. 12-1 at 588.  In May 2013, Dr. Clarke referred Pellerin to a sleep lab due to her problem with excessive daytime somnolence, and to a bariatric clinic.  ECF No. 12-1 at 591.  Dr. Clarke also recommended magnesium for Pellerin's stable chronic pain/fibromyalgia.  ECF No. 12-1 at 592.

In September and November 2013, Pellerin had polysomnography tests that demonstrated mild obstructive sleep apnea syndrome.  ECF No. 12-1 at 371, 508.  Dr. Beth Forrest Clarke, an otolaryngologist, prescribed CPAP therapy and advised Pellerin to lose weight.  ECF No. 12-1 at 371-74, 508.  Dr. Andrew Clarke noted that

Pellerin's chronic daily headache is probably exacerbated by her nocturnal hypoxia. ECF No. 12-1 at 595.

In June 2014, Dr. Andrew Clarke evaluated Pellerin for back pain. ECF No. 12-1 at 440. Pellerin weighed 272 pounds and her blood pressure was 130/90. ECF No. 21-1 at 441. Pellerin had "significant discomfort" with palpation directly over the left mid buttock (the cause was unclear) and equivocal straight leg raises bilaterally, but her deep tendon reflexes were normal, and the muscle strength in her lower extremities was normal bilaterally. ECF No. 12-1 at 443, 602-03. Pellerin was diagnosed with sciatica and a repeat MRI was ordered. ECF No. 12-1 at 443, 603. Pellerin was also diagnosed with fibromyalgia and depression. ECF No. 12-1 at 443.

X-rays of Pellerin's lumbar spine in June 2014 showed minimal spondylosis of the lumbar spine. ECF No. 12-1 at 464. An MRI of her lumbar spine in July 2014 showed that Pellerin has a large extruded disc at L3-4, a small disc extrusion at L4-5, and a disc protrusion at L5-S1 with moderate foraminal stenosis. ECF 12-1 at 465-66, 468, 624. The L3-4 findings were new since the 2011 MRI, and the L4-5 findings were improved since 2011. ECF No. 12-1 at 467. Dr. Clarke diagnosed radiculitis of the lumbosacral spine, fibromyalgia, situational disturbance, and fugue (dissociative). ECF No. 12-1 at 447, 599-600. Dr. Clarke noted that Pellerin would never control her morbid obesity unless she stopped drinking sodas and eating candy every day. ECF NO. 12-1 at 447.

In August 2014, Pellerin was evaluated by Dr. Jason L. Cormier, a neurosurgeon. ECF NO. 12-1 at 409, 525. Pellerin complained of: pain in her left

6

shoulder that radiated between her shoulder blades, causing numbness in her right arm that went into her fingers; pain in the left side of her rib cage and low back that radiated into her hips bilaterally; and severe right leg pain and numbness down to her knee. ECF No. 12-1 at 409, 525. Dr. Cormier noted her 2008 cervical fusion, past physical therapy, and past diagnosis of fibromyalgia. ECF No. 12-1 at 409, 525. Pellerin was 5' 6" tall, weighed 277 pounds, and her blood pressure was 115/56. ECF No. 12-1 at 409, 525. An MRI of Pellerin's lumbar spine showed lumbar spondylosis with age-related changes; evidence of disc herniation at L5-S1 extending to the left neuroforamen causing minimal compression of the exiting nerve root; and disc herniation at L4-5 and L3-4. ECF No. 12-1 at 410, 526. Pellerin denied having prominent difficulty with her lumbar spine. ECF No. 12-1 at 410, 526.

In September 2014, Dr. Clarke noted that Pellerin weighed 276 pounds. ECF No. 12-1 at 449, 614. He diagnosed anemia, elevated bilirubin, dyspepsia, and dysesthesia. ECF No. 12-1 at 450, 614-15.

Pellerin was evaluated in September 2014 by D. James Lipstate, a rheumatologist, for neck and back pain. ECF No. 12-1 at 331. Pellerin complained of chronic neck and back pain and diffuse aches, pains, and stiffness that were exacerbated with exercise, but not accompanied by swelling or inflammation in joints. ECF No. 12-1 at 331. Pellerin's family doctor had diagnosed her with fibromyalgia in 2012. ECF No. 12-1 at 331. Pellerin also complained of frequent headaches, fatigue, and irritable bowels. ECF No. 12-1 at 331. Pellerin also had sleep apnea and used a CPAP, degenerative disc disease in the neck and back with chronic pain (mostly in

the right leg), vitamin D deficiency, some past depression, and neck surgery in 2008. ECF No. 12-1 at 331. Pellerin was 5' 5.5" tall and weighed 279 pounds, and her blood pressure was 121/78. ECF No. 12-1 at 331, 516. Pellerin had a full range of motion in her back with spine tenderness in the lumbosacral region. ECF No. 12-1 at 332, 517. Pellerin also had myofascial tenderness in the paracervical and trapezius regions; was tender across the lower back, in the elbows (with no synovitis), and over the trochanteric areas of the hips and inner aspects of the knees; and had good ranges of motion in her extremities with no edema. ECF No. 12-1 at 332, 517. Following comprehensive lab work, Dr. Lipstate found Pellerin's serologic studies on her lupus panel were normal (making lupus unlikely), her chemistries were acceptable, and there were no indicators of inflammation. No. 12-1 at 329. Dr. Lipstate diagnosed fibromyalgia syndrome; myositis; cervical pain syndrome; sleep apnea; and thalassemia minor (no major problems). ECF No. 12-1 at 329, 332, 514. Dr. Lipstate prescribed duloxetine, tramadol, continued use of her CPAP, and a low carbohydrate diet. ECF No. 12-1 at 332.

In November 2014, Pellerin had an MRI of her cervical spine that showed a previous anterior cervical fixation with anterior hardware, a C5-6 intradiscal fusion, and a nonspecific reversal of cervical lordosis. ECF No. 12-1 at 343, 471. Pellerin had a mild posterior disc bulge at C3-4 without central canal or foraminal stenosis; a mild posterior disc bulge at C4-5 without spinal stenosis; and a right paracentral disc extrusion/herniation extending slightly superior and inferior to the disc space level, causing mass effect on the anterolateral thecal sac resulting in mild central canal

8

stenosis.    ECF No. 12-1 at 343-44,443-44, 471, 626-27.    Following the MRI, Dr. Cormier noted Pellerin's complaints of all-over stiffness; headache; her right leg stays "dead"; a burning sensation in both hips; hypersensitivity and numbness in her right leg only, with the symptoms stopping just below her right knee; and a stabbing pain between her shoulders and in her right chest.    ECF No. 12-1 at 411, 657.    Dr. Cormier found tenderness over her cervical spine on palpation; her low back pain increased on flexion and extension; and her right and left lateral flexion were mildly limited. ECF No. 12-1 at 411, 657.    Dr. Cormier found C6-7 disc herniation with mild to moderate spinal cord compression and associated right neural foraminal nerve root compression.    ECF No. 12-1 at 412, 659.    Pellerin was diagnosed with cervical disc disease with myelopathy, back pain, degenerative disc disease (lumbar), lumbar spondylolysis, and bulge of lumbar disc without myelopathy.    ECF No. 12-1 at 413, 659.    A C6-7 fusion was recommended but Pellerin stated she did not want surgery. ECF No. 12-1 at 413, 659.    Robaxin was prescribed for muscle spasm.    ECF No. 12-1 at 413, 659.

In December 2014, Pellerin's weight was down to 267 pounds.    ECF No. 12-1 at 452.    Pellerin reported she had stopped drinking sweetened drinks.    ECF No.12-1 at 453, 612.    Dr. Clarke assessed degenerative joint disease/cervical stenosis/neck and arm pain, fibromyalgia/depression, fatty liver, obstructive sleep apnea, and non-compliance with CPAP.    ECF No. 12-1 at 452-53, 611-12.

Also in December 2014, Pellerin had synovitis and osteoarthritic changes in multiple joints.    ECF No. 12-1 at 325.    Dr. Lipstate diagnosed fibromyalgia and

myositis, cervical disorder enthesopathy–neck, and low back pain, and continued Pellerin's tramadol prescription.  ECF No. 12-1 at 325-26.

In January 2015, Pellerin complained of pain in and around her right ear.  ECF No. 12-1 at 454-55, 608.  Dr. Clarke diagnosed probable TMJ and gave her a Toradol shot.  ECF NO. 12-1 at 455, 609.

In April 2015, Dr. Cormier saw Pellerin for complaints of leg spasms causing her leg to feel dead.  ECF No. 12-1 at 414, 660.  Pellerin again said she did not want surgery due to financial straits.  ECF No. 12-1 at 414, 660.  Pellerin weighed 259 pounds.  ECF No. 12-1 at 415,661.  Surgery was again recommended.  ECF 21-1 at 416, 662.

Dr. Clarke also saw Pellerin in April 2015, for complaints of muscle pain and knots in both legs, 616.  ECF No. 12-1 at 456.  Dr. Clarke removed a skin lesion (benign), gave her a shot of Decadron for her leg pain, and told her to continue seeing Dr. Cormier.  ECF No. 12-1 at 458, 528, 617-18.

On December 24, 2015, Pellerin was treated in the emergency room for dyspnea.  ECF No. 12-1 at 337.  Pellerin complained of  shortness of breath since that morning, and stated she had been out of anxiety medicine for several months and having episodes of shortness of breath since October.  ECF No. 12-1 at 420, 423.  Pellerin reported a history of asthma and chronic bronchitis. ECF No. 12-1 at 420.  X-rays showed no active pulmonary disease.  ECF NO. 12-1 at 426, 429.  Pellerin was prescribed an albuterol inhaler, alprazolam, pantoprazole, and prednisone.  ECF No. 12-1 at 339.

In February 2016, Dr. Clarke noted that Pellerin had not found a job so she was working in her mother's dog kennels. ECF No. 12-1 at 619. Pellerin reported she would get up in the morning, eat breakfast, work for 6 hours without a break, go home and rest a little, get up and fix supper, go to bed, then get up and do it again the next day. ECF No. 12-1 at 619. The work involved a lot of bending, lifting, and working around a lot of smells and chemicals, so her fibromyalgia had flared up and she developed a cough. ECF No. 12-1 at 619.

Pellerin was examined by Dr. Julana D. Monti, a general practice doctor, in April 2016, on referral from the State of Louisiana Disability Determinations Service. ECF No. 12-1 at 429. Pellerin, who had worked as a legal secretary for 26 years, reported having been let go by her boss of 17 years because she could no longer remember how to fill out paperwork and do tasks, and could not recall telephone conversations. ECF No. 12-1 at 430. Pellerin reported her history of fibromyalgia, low back pain and disc herniations, numbness in her left arm, past cervical fusion, chronic bronchitis, and shortness of breath with exertion. ECF No. 12-1 at 431. Pellerin weighed 252 pounds and her blood pressure was 110/80. ECF NO. 12-1 at 432. Dr. Monti found only two of 18 possible trigger points and no point tenderness. ECF No. 12-1 at 433. Pellerin had limited extension and rotation in her cervical spine, and limited extension in her lumbar spine. ECF 12-1 at 435-36. Dr. Monti diagnosed degenerative disk disease of the lumbar spine and cervical spine, chronic bronchitis, and fibromyalgia. Doc. 12-1 at 433. Dr. Monti concluded that, in an eight hour work-day, Pellerin can sit up to eight hours, stand up to six hours, walk up to

11

six hours without an assistive device, lift/carry up to 10 pounds, and would have difficulty driving or performing fine motor tasks (such as writing) for prolonged periods. Doc. 12-1 at 434. Dr. Monti stated those restrictions would be reduced if she receive surgical correction of her cervical myelopathy. Doc. 12-1 at 434. Dr. Monti further found Pellerin might have some difficulty maintaining concentration on difficult subjects. Doc. 12-1 at 434.

Also in April 2016, Dr. Sheryl Smith reviewed Pellerin's medical records and noted her severe obesity, degenerative disc disease of the lumbar spine and cervical spine (with myelopathy), chronic bronchitis, and fibromyalgia. ECF No.1 2-1 at 158. Dr. Smith filled out a physical residual functional capacity assessment, finding Pellerin: can occasionally lift/carry 20 pounds; can frequently lift/carry 10 pounds; can stand/walk up to 6 hours in an 8-hour day; can sit up to 6 hours in an 8-hour day; can do unlimited pushing/pulling (except as limited by the lift/carry limitation); can only occasionally climb ladders/ropes/scaffolds; can only occasionally stoop; is limited in her ability to reach in any direction; can only occasionally manipulate objects; must avoid concentrated exposure to extreme cold; and must avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. ECF No. 12-1 at 161-63.

In June 2016, Dr. David Atkins, a psychologist, filled out a psychiatric review technique form after reviewing Pellerin's medical records. Dr. Atkins found Pellerin has only mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence or

pace; and her anxiety disorder does not limit her ability to perform and sustain basic work activities.  ECF 12-1 at 159.

Dr. Cormier saw Pellerin in October 2016 for complaints of neck pain and muscle spasms in her legs.  ECF No. 12-1 at 663.  An MRI of Pellerin's lumbar spine, in October 2016, showed a developing right paracentral disc protrusion/herniation at L3-L4 along with facet and ligamentum flavum hypertrophy, resulting in mild central canal stenosis.  ECF No. 12-1 at 628, 666.  The disc extrusion/herniation at L3-L4 was resolved.  ECF No. 12-1 at 628, 666.  There were also: a posterior disc bulge, facet and ligamentum flavum hypertrophy at L4-5; facet hypertrophy at L5-S1 without disc herniation or central canal stenosis; and unchanged mild left foraminal stenosis.  ECF No. 12-1 at 628-29, 666-67.  An MRI of Pellerin's cervical spine showed straightening of the cervical spine; unchanged small posterior disc bulge at C3-C4 and C4-C5; developing left lateral disc protrusion/herniation at C5-C6 causing mass effect on the exiting ventral nerve root within the proximal left foramen; and unchanged right paracentral disc extrusion/herniation at C5-C6 resulting in mild central canal stenosis.  ECF No. 12-1 at 631, 669.

In November 2016, Pellerin was evaluated at the mental health clinic (psychiatrist Dr. Ching Shih Hu).  ECF No. 12-1 at 681.  Pellerin cried the entire session about her lack of goals, pain, bad relationships, lack of income, and responsibility for her adopted granddaughter.  ECF No. 12-1 at 681.  Pellerin's mood was anxious and dysphoric, and her affect was blunted.  ECF No. 12-1 at 686.  Pellerin was diagnosed with severe major depressive disorder, single episode, and

unspecified anxiety disorder.  ECF No. 12-1 at 689.  She was prescribed Lexapro. ECF No. 12-1 at 689.

Pellerin went to counseling from November 2016 thru June 2017.  ECF No. 12-1 at 51-84.   In November 2016, Pellerin's affect was slightly blunted and she was slightly anxious.  ECF No. 12-1 at 54.  In March 2017, Pellerin had marked depression and anxiety.  ECF No. 12-1 at 65.  In April 2017, Pellerin reported panic attacks, and was diagnosed with severe major depressive disorder, single episode, and anxiety disorder.  ECF No. 12-1 at 69, 74.

In March 2017, Dr. Cormier noted that Pellerin continued to have a lot of neck pain, shoulder pain, numbness in both arms, and weakness in her hand grasp, but her back pain was tolerable.  ECF No. 12-1 at 675.  Dr. Cormier noted the disc bulges at L3-4 and L4-5, and referred Pellerin to Shreveport for further treatment.  ECF No 12-1 at 675.

In January 2017, Pellerin reported worsening left knee pain for five weeks. ECF No. 12-1 at 645.  There was mild effusion and medial tenderness, and a sprain was diagnosed.  ECF No. 12-1 at 645-46.  Pellerin was also found to be lethargic; anemic; overanxious; depressed; vitamin D deficient; had irritable bowel syndrome with diarrhea; and had fibrositis.  ECF No. 12-1 at 647-48.  Pellerin weighed 259 pounds and her blood pressure was 120/88.  ECF No. 12-1 at 647-48.  Pellerin was prescribed vitamins, Imodium, acetaminophen with codeine, diclofenac sodium, and Zantac.  ECF No. 12-1 at 648.

### C.    <u>Administrative Hearing</u>

At the 2017 administrative hearing, Pellerin testified that she was 5'6" tall and weighed about 267 pounds.  Pellerin testified that she has gained about 25 pounds since she was put on "all this medication."  ECF No. 12-1 at 97.  Pellerin testified that she does not know which medication has caused her to gain weight, but she does not eat much because her stomach gets upset.  ECF No. 12-1 at 98.

Pellerin testified that she graduated from high school and started college, but did not finish.  ECF No. 12-1 at 100.  She lives with her husband and adopted seven-year-old granddaughter.  ECF No. 12-1 at 98.  Pellerin testified that she drives unless she is having a bad day, because she gets disoriented.  ECF No. 12-1 at 99.

Pellerin last worked in May 2015, part-time at her mother's kennels, helping to feed the puppies and clean the kennels.  ECF No. 12-1 at 100.  Before that, Pellerin worked for 15 years as a legal secretary and a notary.  ECF No. 12-1 at 101, 123, 142. Pellerin answered phones, did paperwork, and helped clean.  ECF No. 12-1 at 100. The heaviest object Pellerin lifted was a 25 to 30 pound file box.  ECF No. 12-1 at 102. Pellerin received unemployment benefits after she stopped working, so she applied for all kinds of jobs.  ECF No. 12-1 at 103.  Pellerin was overqualified for fast food-type jobs and underqualified for other jobs.  ECF No. 12-1 at 103.

Pellerin testified that she can no longer work because her fibromyalgia makes her hurt all the time and causes problems with her memory.  ECF No. 12-1 at 105, 142.  In 2015, she lost her job, then her husband wanted a divorce, so she was homeless and jobless; she received too much child support to qualify for food stamps.

15

ECF No. 12-1 at 105.  Stress made Pellerin begin to feel really bad and caused her legs to knot up.  ECF No. 12-1 at 106.  Both of Pellerin's knees are bad; she needs another neck surgery; she has lost upper body strength; her arms are numb "all the time" and she cannot hold them up; she cannot hold a gallon of milk or twist a cap off a bottle; her right leg feels numb and "dead" but hurts if touched; she has memory problems and difficulty making a decision; she has a bulging disk in her back and fibromyalgia; and she has muscle spasms and leg cramps all the time.  ECF No. 12-1 at 106-107.  Pellerin has constant pain; some days are better than others.  ECF No. 12-1 at 107-108.  Pellerin stays in bed on really bad days, which occur about three times per week.  ECF No. 12-1 at 108-109.  Pellerin has one to two good days per week, when her pain is tolerable.  ECF No. 12-1 at 109.  When her pain is really bad, Pellerin takes Tylenol with codeine about twice a week, but it makes her sleepy.  ECF No. 12-1 at 109-10, 112.  Pellerin also uses a heating pad when she gets stiff, and takes a muscle relaxer (Robaxin) almost every day to prevent muscle spasms.  ECF No. 12-1 at 112-13.

Pellerin has been insured by Medicaid since 2016, so now she sees Dr. Tran in stead of Dr. Clarke.  ECF No. 12-1 at 110.  Pellerin started going to Tyler Mental Health in September 2016 due to her sleepiness, crying, and anxiety.  ECF No. 12-1 at 110-11.  Pellerin is in the process of transferring to Iberia Mental Health because it is closer to home.  ECF No. 12-1 at 113-14.  Counseling has helped Pellerin to cry less.  ECF No. 12-1 at115.

Pellerin testified that she tore something in her right knee when she tried to get up from the floor.  ECF 12-1 at 116.  In January 2017, she awoke to a swollen, hot left knee that would not bear her weight for about three months.  ECF No. 12-1 at 116.  Pellerin testified that Dr. Tran thought she had torn her left knee and that she had arthritis, too.  ECF No. 12-1 at 116.  Pellerin had an appointment at the orthopedic clinic at the end of the month.  ECF No. 12-1 at 116.

Pellerin testified that she can stand or walk for only small distances at a time, such as from her house to a chair in her back yard, because she gets very winded.  ECF No. 12-1 at 116.  Pellerin cannot climb stairs because of problems with her back and knees; she uses a ramp at her house.  ECF No. 12-1 at 117.  Pellerin can sit for 20 to 25 minutes due to pain in her lower back, legs, hips, and shoulder blades.  ECF No. 12-1 at 117.  After sitting for a while, Pellerin has to stand up and move around a little.  ECF No. 12-1 at 117.  Pellerin cannot pick up a gallon of milk, a pot of water, or boxes.  ECF NO. 12-1 at 117-18.

Pellerin testified that, during the day, she stays home and sleeps late, then gets up in the afternoons when her granddaughter gets off the school bus and makes sure her granddaughter does her homework.  ECF No. 12-1 at 118.  Afterward, Pellerin might walk her dogs outside, then return inside and lie down.  ECF No. 12-1 at 118.  Pellerin used to dance, play pool, and do photography, but cannot do those things anymore.  ECF No. 12-1 at 118, 139.  Pellerin used to belong to a photography club, but quit because she could not participate in the educational outings.  ECF No. 12-1 at 139.  Pellerin's husband manages the money and pays the bills.  ECF No. 12-

1 at 119.  Pellerin can cook easy meals that do not require her to stand and stir a pot. ECF NO. 12-1 at 119-20.  Pellerin's husband lifts the heavy pots for her.  ECF No. 12-1 at 119.  Afterward, Pellerin washes the dishes a few at a time, sitting down periodically.  ECF No. 12-1 at 120.  Pellerin's husband washes clothes and her granddaughter pushes a dust mop around.  ECF No. 12-1 at 120.  Pellerin goes to the grocery store with her husband and holds onto the buggy while she walks.  ECF No. 12-1 at 121.  Pellerin she does not walk her dogs on a leash.  ECF No. 12-1 at 121-22. Pellerin's husband washes her hair because she cannot lift her arms, and sometimes has to help her with her clothes.  ECF No. 12-1 at 143.  Pellerin's granddaughter helps her with her shoes and socks.  ECF No. 12-1 at 143.

Pellerin testified that her worst problem is her fibromyalgia because of the brain fog it causes.  ECF No. 12-1 at 122.  Pellerin had to stop working as a legal secretary and a notary because, in the last year she worked, she could not remember things she was supposed to do, or how to do things, or conversations she had on the phone.  ECF No. 12-1 at 123, 141-42.  The fibromyalgia, along with her anemia (beta thalassemia) also causes Pellerin to stay tired.  ECF No. 12-1 at 125.  The fibromyalgia also causes pain all over Pellerin's body, and the disc at C6-7 is causing pain in Pellerin's shoulders, arms, and hands.  ECF No. 12-1 at 127-128.  Pellerin has sciatica in her back and down her left leg.  ECF No. 12-1 at 129.  Pellerin also has had irritable bowel syndrome for four years.  ECF No. 12-1 at 125.

Pellerin testified that she has trouble riding in a car because she has to shift positions often when her hips starts hurting.  ECF No. 12-1 at 130.  Pellerin also has

to shift positions a lot when she sleeps: lying on her back makes her lower body numb, and lying on either side makes that leg hurt.  ECF No. 12-1 at 130.  Pellerin's knee pain, caused by arthritis and "something torn," comes and goes, and prevents her from kneeling or climbing stairs.  ECF No. 12-1 at 136.

Pellerin's anxiety causes shaking hands, stomachaches, and chest pains.  ECF No. 12-1 at 131-32.  When her chest starts to hurt, she has to lay down.  ECF No. 12-1 at 132.  Her anxiety medication makes her feel like a zombie.  ECF No. 12-1 at 131.  Pellerin's depression makes her cry a lot and not want to do anything.  ECF No. 12-1 at 133-34.  Pellerin testified that she was the heaviest she had ever been, at 277 pounds.  ECF No. 12-1 at 134-35.  Pellerin said her medication caused her to gain weight.  ECF No. 12-1 at 135.  Pellerin's weight causes her to struggle more to get up from a chair, and to hurt when she stands for any length of time.  ECF No. 12-1 at 135.  Pellerin does not eat much because her stomach immediately starts to cramp and hurt, then she has to go and sit in the bathroom.  ECF No. 12-1 at 135-36.

Pellerin is supposed to use a CPAP machine for her sleep apnea, but has not been using it because it is not staying clean enough so it causes upper respiratory infections.  ECF No. 12-1 at 137.  Instead, Pellerin takes medication to help her sleep that works sometimes.  ECF No. 12-1 at 138.  Pellerin gets up when it is time for her granddaughter to get on the bus, then goes back to bed.  ECF No. 12-1 at 138.  Pellerin sleeps most of the day, and plays on her phone some, but does not watch daytime TV.  ECF No. 12-1 at 138.

Pellerin's husband, Kyle Pellerin ("Kyle"), testified that Pellerin had had a great work ethic 10 years ago; she would wake up and go to work every morning. ECF No. 12-1 at 145.  Now, on a bad day, Pellerin can barely get of bed and move around.  ECF 12-1 at 145.  Kyle has to helps her stand up, helps her shower, washes her hair, and helps her dress.  ECF No. 12-1 at 145.

Kyle testified that Pellerin is not able to do the things she used to enjoy, such as dancing, shooting pool, and doing photography, and is no longer able to work.  ECF No. 12-1 at 145.

The VE testified that Pellerin's past work as a legal secretary (DOT[2] 201.362-030) was sedentary and SVP 6.[3]  The ALJ posed a hypothetical involving a person of Pellerin's age, education, and work history, who is limited to sedentary work, and who has nonexertional limitations of: (1) can only occasionally climb, kneel, balance, stoop, crouch, crawl; (2) can only occasionally reach overhead; (3) must avoid concentrated exposure to extreme cold; (4) no exposure to pulmonary irritants; (5) can do frequent but not constant tasks involving handling and fingering; (6) must change position for one to two minutes every 30 minutes without being off task or away from the workstation; (7) is limited to simple, routine, repetitive work that involves simple,

---

[2] Dictionary of Occupational Titles.

[3] "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  S.S.R. 00–4p, 2000 WL 1898704, at *3 (2000); see also 20 C.F.R. § 404.1568.

work-related decisions; and (8) can have only occasional interaction with the public, coworkers, and supervisors. ECF No. 12-1 at 149-50. The VE testified that such a person could not perform her past work as a legal secretary. ECF No. 12-1 at 150. However, such a person could perform other work such as: (1) polisher (DOT 713.684-038, sedentary, SVP 2) (73,500 jobs existing nationally); (2) surveillance system monitor (DOT 379.367-010, sedentary, SVP 2) (120,200 jobs existing nationally); and (3) final assembler (DOT 713.687-018, sedentary, SVP 2) (241,900 jobs existing nationally). ECF No. 12-1 at 150. The VE further stated that the need to change positions every 30 minutes is not addressed in the DOT, but is not inconsistent with the DOT information as long as the person is able to remain on-task. ECF No. 12-1 at 150.

The ALJ posed a second hypothetical involving the same person with the additional limitation of only occasionally handling and fingering. ECF No. 12-1 at 151. The VE testified the only job such a person could do would be surveillance system monitor. ECF No. 12-1 at 151.

The ALJ posed a third hypothetical involving the same person in the first hypothetical, but with the additional limitation of not being able to perform even simple tasks for two-hour blocks of time during the workday. ECF No. 12-1 at 151. The VE testified that person would not be able to perform any jobs. The VE further testified that, if the person missed 2 days of work per week, she would not be able to do any jobs because employers normally allow only one day of sick leave per month. ECF NO. 12-1 at 151.

21

### D.    ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Pellerin (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 514 U.S. 1120 (1995) (citing *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy.  *See Greenspan*, 38 F.3d at 237.

In the case at bar, the ALJ found that Pellerin has not engaged in substantial gainful activity since June 1, 2015.  ECF No. 12-1 at 28.   Pellerin has severe impairments of degenerative disc disease of the cervical and lumbar spine, restrictive pulmonary disease, fibromyalgia, obesity, major depressive disorder, and anxiety disorder, but she does not have an impairment or combination of impairments listed

in or medically equal to one listed in Appendix 1. ECF No. 12-1 at 28. The ALJ also found that Pellerin is unable to perform any of her past relevant work. ECF No. 12-1 at 35.

At Step No. 5 of the sequential process, the ALJ further found that Pellerin has the residual functional capacity to perform sedentary work with the following limitations: (1) no more than occasional climbing, kneeling, balancing, stopping, crouching, and crawling; (2) no more than occasional overhead reaching; (3) no concentrated exposure to extreme cold; (4) no exposure to pulmonary irritants; (5) frequent but not constant tasks of handling and fingering; (6) only simple, routine, repetitive work; (7) only simple work-related decisions; (8) only occasional interaction with the general public, supervisors, and coworkers; and (9) must be able to change position for one to two minutes every thirty minutes without being off-task or away from the work station. ECF No. 12-1 at 30.

The ALJ found that the claimant is a younger individual with a high school education, and that transferability of work skills is immaterial (Tr. pp. 35-36). The ALJ concluded there are a significant number of jobs in the national economy that Pellerin can perform, such as polisher, surveillance system monitor, and final assembler and, therefore, Pellerin was not under a "disability" as defined in the Social Security Act at any time from June 1, 2015 (the disability onset date) through the date of the ALJ's decision on August 28, 2017. ECF No. 36-37.

## II.    Law and Analysis

### A.    Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. *See McQueen v. Apfel*, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. *See Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. *See Singletary v. Bowen*, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. *See Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987); *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. *See Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981); *see also Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. *See Dellolio*,

705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  *See Johnson v. Bowen*, 864 F.2d 340 (5th Cir. 1988); *Dellolio*, 705 F.2d at 125; *see also Henderson v. Colvin*, 520 Fed. Appx. 268, 272 (5th Cir. 2013) ("[A] finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidence to support the decision.").

### B.    The Commissioner's finding that Pellerin can do a limited range of sedentary work is supported by substantial evidence.

Pellerin contends on appeal that the ALJ committed reversable error in refusing to accept the testimony of the VE as to the ability of Pellerin to do sedentary work with the limitations identified by the medical evidence and testified to by Pellerin (that she would be off-task and miss  several days of work per month), which would eliminate all of the sedentary jobs identified by the VE.  ECF No. 15.  Pellerin points to the medical reports from Dr. Cormier (November 2014 and April 2015 reports at ECF No. 12-1 at 411, 423, 661), Dr. Clarke (June 2014 report at ECF No. 12-1 at 440), Dr. Lazaro (2012 report at ECF No.12-1 at 505), and Dr. Lipstate (September 2014 report at ECF No. 12-1 at 516), and her 2014 lumbar and cervical spine MRIs (ECF No. 12-1 at 465, 471).  ECF No. 15 at 3.  Pellerin argues those reports support her complaints of pain and muscle spasms, and show she declined neck surgery because she could not afford it.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level

of pain alleged. The mere existence of pain or other symptoms does not automatically create grounds for disability, and subjective evidence of them will not take precedence over conflicting medical evidence. *See Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citing *Owens v. Heckler*, 770 F.2d 1276, 1281 (5th Cir. 1985)). The factual determination of whether the claimant is able to work despite her pain or other symptoms is within the discretion of the ALJ and will be upheld if supported by substantial evidence. *See Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to her symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §404.1529(c)(4).

Subjective complaints of pain must be corroborated by objective medical evidence. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2000). Although severe pain can constitute a nonexertional impairment, pain is a disabling condition only when it is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522.

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. *See Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983) (citing *Laffoon v. Califano*, 558 F.2d 253, 254-55 (5th Cir. 1977); *see also Dominguez v. Astrue*, 286 Fed. Appx. 182, 186 (5th Cir. 2008). A factfinder's evaluation of the credibility of subjective complaints if entitled to judicial deference if supported by

substantial record evidence. *See Dominguez*, 286 Fed. Appx. at 186 (citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

The ALJ made the following findings as to Pellerin's pain and credibility (ECF No. 12-1 at 34-35):

> The medical evidence as a whole does not entirely support the claimant's statements concerning the intensity, persistence and limiting effects of her symptoms. Examinations have revealed slightly reduced strength, positive Hoffman's sign, a limping gait, and tenderness and reduced range of motion in the cervical and lumbar spine, which would support her allegations that she had weakness and numbness in her upper extremity. (Ex. 23F/24-25). Hence, after carefully assessing the claimant's subjective complaints as well as reviewing her medical records, the undersigned finds her allegations are partially consistent with the evidence.

> The claimant testified she does very little as to her daily activities. She has, however, been able to help in her mother's kennels when needed. The claimant minimized this work activity in her testimony, saying she simply fed puppies and sometimes cleaned up their waste, only if the other helper could not work. Other evidence in the file, however, suggests the work was more strenuous than this. (Ex. 19F/62). Further, working at that level exacerbated the claimant's pain and breathing problems. The undersigned accepts that working at that level on a full-time basis would not be sustainable for the claimant; however, full-time work within the modified sedentary residual functional capacity set forth above would not be expected to have the same effect as working in the kennels.

> In sum, the above residual functional capacity assessment is supported by the evidence when considered as a whole. The medical records and the claimant's activities of daily living support the residual functional capacities during the relevant periods.

The ALJ properly considered the record as a whole, including the available medical evidence and the nature and extent of the plaintiff's daily activities, in determining that the plaintiff's subjective complaints were not fully credible. *See Hoelck v. Astrue*, 261 Fed .Appx. 683, 686 (5th Cir. 2008).

Pellerin contends the ALJ erred in failing to adopt the VE's conclusion that there are no jobs for an individual who cannot work in two-hour blocks during the workday, or who would miss two days or work per week. Pellerin has not pointed to any evidence that indicates she cannot work in two-hour blocks of time or that she had to stop working because she missed too much work.[4] Therefore, the ALJ did not err disregarding the VE's statement that there are no jobs for an individual who cannot work in two-hour blocks.

Since the ALJ in this case has made the mandatory indication of the basis for his credibility choices concerning claimant's complaints, and since his choices are not unreasonable, his finding that Pellerin's pain would not prevent Pellerin from performing a limited range of sedentary work is proper. *See Carry v. Heckler*, 750 F.2d 479, 485-86 (5th Cir. 1985). Substantial evidence supports the Commissioner's conclusion that Pellerin is not disabled by pain.

## III.    <u>Conclusion</u>

Because the Commissioner's findings as to Pellerin's pain and credibility are supported by substantial evidence, IT IS RECOMMENDED that Pellerin's appeal be DENIED AND DISMISSED WITH PREJUDICE.

---

[4] Pellerin's former employer represented her during her hearing. His questions and Pellerin's testimony indicated he let her go due to her memory problems. ECF No. 12-1 at 123.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _21st_ day of February 2020.

Joseph H.L. Perez-Montes
United States Magistrate Judge